70 B.R. 98 (1987)
In re Mark Douglas CHUNING & Paula Renee Chuning, Debtors.
Charles E. RUBIN, Trustee, Plaintiff,
v.
The REORGANIZED CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, et al., Defendants.
Bankruptcy No. 86-01767-2, Adv. No. 86-0399-2.
United States Bankruptcy Court, W.D. Missouri.
February 20, 1987.
Joyce B. Kerber, Independence, Mo., for defendant RLDS.
*99 Stephen B. Strayer, Kansas City, Mo., for debtors.
Robert Pummill, Kansas City, Mo., for trustee.
FRANK W. KOGER, Bankruptcy Judge.

MEMORANDUM OPINION AND ORDER

BACKGROUND
This well tried on both sides adversary matter comes before the Court on the Complaint of the Trustee against the Reorganized Church of Jesus Christ of Latter Day Saints (RLDS) to determine lien status and to compel turnover of property. The debtors, but primarily Mark Douglas Chuning, had been engaged in farming as a share cropper for the RLDS since 1983. Prior to that time he had worked with his father who had been a share cropper for RLDS for many years.
The RLDS has accumulated a very substantial acreage of raw land, primarily in Eastern Jackson County and Southern Clay County and is a long term and experienced landlord, having a specialized department for farm management within the organizational structure of the church. Under the RLDS sharecrop contract, the church furnished the land and buildings, debtors furnished the labor, machinery, and certain costs were shared between the tenant and the landlord.
To assist the tenants, the RLDS, in effect, financed the farm related (and some personal) expenses of the tenants. As seed, fertilizer, herbicide, fuel and other items were needed, the tenant would charge the items, RLDS would pay the bill, and the charge would be placed on the tenant's account or on the church's account.
As the crops were harvested, they were delivered to the Atherton Elevator and stored there or transferred to the Security Grain Company which maintained storage facilities in underground caves in Eastern Jackson County. It is important to note that the testimony indicated that the Atherton Elevator was and is a private elevator owned by the RLDS but that Security Grain Company was and is a separate corporation, not owned by RLDS. As the harvest was received by the elevator, it was graded, cleaned. dried or whatever was needed and one-half was stored in the tenant's name and one-half in the RLDS name. The tenant could then sell, borrow against from a government farm program, or hold his one-half of the harvest, whatever he chose to do. However, if he sold or borrowed on his one-half of the harvest he would then settle up with the RLDS for the amounts advanced by the RLDS.
Debtors farmed under this arrangement through the 1983, 1984 and 1985 crop years. In March of 1983, debtors' account showed a balance of some $7,000.00 owing to the RLDS. By March of 1984, the balance was some $26,000.00. By March of 1985, the balance due was approximately $25,000.00 but debtor had some 2,100 bushels of beans in storage with Security Grain Company. By March of 1986, the account balance stood at approximately $33,000.00 and debtor had in storage with Security Grain Company the 1984 crop year beans mentioned above plus another 2,000 bushels of beans for a total of 4,176.95 bushels. Even at today's depressed prices, this amounted to some $18,000.00 and those soy beans are the subject of this controversy.
The Trustee claimed that the beans were the debtors' beans and thus property of the estate. The RLDS claimed a perfected security interest and, therefore, disputed the Trustee's claim. All of the facts stated heretofore were undisputed, but there was substantial disagreement between the Trustee's evidence and the RLDS's evidence as to what happened starting in March of 1985. Four witnesses were called: debtor, Mark Douglas Chuning, and James B. Jones, president of the First State Bank Buckner (another creditor of debtors) for the Trustee; and Don Elefson, Senior Farm Management head, and Donald Derrington, the present Farm Manager, for the defendant RLDS.
*100 It was debtor Chuning's story that in the spring of 1985 he had talked to Mr. Elefson and Mr. Derrington about farming again for crop year 1985. He testified that the RLDS had wanted him to agree to turn over all of the proceeds of all his crops to the RLDS to reduce his balance, but he had told them he could not do so. According to debtor, he also had a loan, secured by a perfected lien on all his farm machinery to the First State Bank of Buckner and that he told them he planned to make a payment to said bank from his winter wheat harvest and then would use his soybeans to pay the RLDS. He denied that he ever signed a security agreement, that he ever gave the RLDS a security interest in, or a pledge of, either the already harvested and stored 1984 bean crop or the 1985 to be harvested beans. It was the testimony of the aforesaid James B. Jones that his bank had later foreclosed the farm machinery and also had gotten a payment in the summer of 1985 from debtors' share of the wheat. Mr. Jones also testified that Mr. Elefson had come to him sometime in 1986 and asked him to write a letter or give a statement to the effect that the RLDS had a secured position in debtors' share of the 1984 and 1985 soybeans. He further testified that Mr. Elefson also wanted to pool resources with the bank, have a farm auction, sell all of debtors' farm assets and divide the money. He testified that he declined on both counts and at least indicated he knew nothing of any secured position being given to the RLDS.
Mr. Elefson and Mr. Derrington remembered the March 1985 conversation differently. Although neither ever used the words "grant or give a security interest in the 1984 and 1985 soybeans" or the words "pledge the 1984 and 1985 soybeans", the heart of their testimony indicated that they felt at a minimum that the debtors were promising to give the RLDS all the money from the 1984 bean crop and the 1985 bean crop. Mr. Elefson also did not recall the conversation with Mr. Jones in the same light as Mr. Jones did. Finally, Mr. Derrington totally disagreed that he had said debtors could borrow against the 1985 beans in about December of 1985 or January of 1986. Debtor, Mark Chuning, reiterated in rebuttal that such latter agreement had been made and that it was only after harvest that he was refused the delivery receipt which would enable him to borrow on his beans, a requirement necessitated by the fact that the RLDS had terminated the share crop arrangement in early 1986 and would no longer allow debtors to charge any necessities.

DISCUSSION
The Trustee's position was that the RLDS was keeping the Security Grain Company from releasing the soybeans to either debtor or the Trustee; that the RLDS had no valid security interest in the soybeans and that, therefore, the Court should order turnover of the beans to the Trustee. The RLDS position was that it possessed a valid, oral security interest, perfected by possession and, therefore, that it was entitled to retain possession and convert the soybeans to cash and apply the cash to its account balance.
There are severe problems with the position of the RLDS. Although a literal reading of Section 400.9-203 Mo.R.S. 1969, leads to the conclusion that an oral security interest can be created in collateral if in the possession of the secured party, the Court is unable to find any reported Missouri case in which a creditor even has attempted to proceed on an oral security interest. Probably there are several reasons. The only modern day situation where the secured creditor is in possession is, of course, the pawn broker business. In a society where the expression "Fly Now-Pay Later" is a watch word, such an arrangement would indeed be contrary to the norm and totally unAmerican. However, there are cases in other jurisdictions that have, although rarely, allowed oral security interests so the Court will examine this as a case of first impression.
Presuming for the moment that oral security interests may be valid, what tests or *101 criteria should be applied. It seems to the Court that:
First: The burden of proof should be on the proponent of the alleged oral security agreement.
Second: The evidence should be clear that language evidencing a definite intent on the part of both the debtor and the creditor was used.
Third: Exclusive possession of the collateral should pass to the creditor contemporaneous with the oral agreement.
Fourth: There should be some line of demarcation that clearly indicates possession is not in the debtor or has changed its previous posture.
If such criteria are correct, then the RLDS cannot prevail. It had the burden of proof which the Court finds it fails in several ways. The evidence was not clear and convincing that language evidencing a definite intent to create a security interest was used. In fact, after considering the answers to interrogatories by the RLDS, as well as the testimony of the three parties present, the Court finds that words signifying the granting of a security interest were not used. Next, there was no change in exclusive possession of the collateral (contemporaneous or not). The 1984 soybean crop remained precisely where it had been for months, i.e., in the possession of Security Grain. Debtors remained in possession of the warehouse receipts which they still had at the date of the hearing and which were introduced into evidence. As to the 1985 soybean crop, it had not even been planted and even after planting remained in the possession of the debtors until harvest some nine months later. It was then delivered to the Atherton Elevator from whence it was transferred to the Security Grain Company. There was no evidence that any procedure different from that always followed by debtors in the past was used. To even the most careful observer, there was nothing to indicate that the beans were being held for RLDS. Counsel for the RLDS, by inference, concede in their brief that the soybeans were not in the possession of the RLDS when they state: "in bins owned or leased by the RLDS Church." The real problem though was that Don Elefson, witness for the RLDS, testified that while the Atherton Elevator was owned by the RLDS, Security Grain was not owned by RLDS and was a separate corporation. Don Derrington further testified that there had never been a setoff of the beans against the debt and that storage charges of 3 Cents per month per bushel were being incurred. Further, there was no line of demarcation that established when possession theoretically passed from the debtors to the RLDS. Finally, there was absolutely nothing that heralded such event or made it apparent to even the most careful observer.
The 1984 soybeans stayed in the identical posture. The 1985 soybeans were not even in existence and once they were harvested, there was nothing in their location or their handling to indicate their possession was in the RLDS rather than debtors while in the same storage facility always used by the debtor for all of his portion of the 1983 harvest and the 1984 harvest.
The Court does not believe that any sactions, punitive damages, or attorney fees against the RLDS would be in order. Obviously, the RLDS had consulted counsel; counsel had constructed an arguable legal position that could sustain the posture of the RLDS. Although the Court has found that position to be pervious to the thrust of the Trustee, it nevertheless was a case of first impression in Missouri, and the Court feels that a creditor must be allowed to assert even novel and unproductive defenses without suffering the slings and errors of sanctions or punitive damages as well as loss of the principal point. However, the storage charges of 3 Cents per bushel per month should not be borne by the Trustee from the time he filed his complaint and those charges should be the responsibility of the RLDS, from date of complaint to date of turnover of the soybeans.

CONCLUSION
This Court has jurisdiction of the issues presented under Sections 157 and 1334 of *102 28 U.S.C. as well as Sections 506 and 542 of 11 U.S.C. This is a core matter. Trustee is entitled to possession of 4,176.95 bushels of soybeans. The storage charges of 3 Cents per bushel per month are assessed against the defendant RLDS from the date of the Trustee's Complaint. No other damages or attorney fees are assessed against defendant RLDS.
The foregoing Opinion shall constitute Findings of Fact and Conclusions of Law in accordance with Rule 7052, Rules of Bankruptcy.