**221**

In re BOCA ARENA, INC., Debtor.

Patricia Dzikowski, Trustee, Plaintiff,

v.

Richard M. Stoeppelwerth, Defendant.

Bankruptcy No. 94–33894–BKC–SHF.
Adversary No. 99–3008–BKC–SHF–A.

United States Bankruptcy Court,
S.D. Florida,
West Palm Beach Division.

July 30, 1999.

Garry W. O'Donnell, Navon, Kopelman & O'Donnell, P.A., Ft. Lauderdale, FL, for chapter 7 Trustee.

Jack F. Weins, Abrams, Anton, Robbins et al., Boca Raton, FL, for chapter 7 Trustee.

James S. Telepman, Cohen Norris Scherer et al., N. Palm Beach, FL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEVEN H. FRIEDMAN, Bankruptcy Judge.

This matter came before the Court on June 28, 1999, for trial on the Chapter 7 Trustee's two-count complaint. In Count I of the complaint, the Trustee seeks turnover of stock owned by the Debtor that is in the possession of the Defendant, Richard Stoeppelwerth. In Count II, the Trustee seeks a determination of the validity of any security interest that Stoeppelwerth claims in the stock. For the reasons set forth below, the Court will enter judgment in favor of the Chapter 7 Trustee and against Stoeppelwerth as to Counts I and II.

Robert Mullin formed Boca Arena, Inc. (the "Debtor") for the purpose of developing a basketball arena for the benefit of the youth of Boca Raton, Florida. Mullin purportedly spent hundreds of thousands of dollars in an attempt to see this arena come to fruition. This money, however, did not come entirely from Mullin. Apparently, Mullin borrowed much, if not all, of this money from Stoeppelwerth. In his attempt to build this arena, Mullin had architectural plans drafted, obtained zoning and building permits and undertook other steps toward the construction of the arena. Mullin also caused the Debtor, on June 12, 1991, to enter into a 50–year ground lease for 6.6 acres of land with the Boca Raton Airport Authority for the site of the proposed arena. As of January, 1993, a number of defaults had occurred under the lease which placed the Debtor's leasehold interest for the 6.6 acres of land in jeopardy. The lease was amended for the third time on March 17, 1993. The amendment established additional obligations and deadlines under the lease. The Debtor was required: (1) to pay $125,000 for the construction of a blast wall adjacent to the property; (2) to arrange for a $2,400,000 loan commitment or letter of credit by April 10, 1993, to ensure construction of the Phase I improvements required under the lease; (3) to pay approximately $8,000 in administrative fees; and (4) to submit plans for the Phase I improvements no later than June 10, 1993 and to commence construction no later than October 20, 1993. The Debtor had no assets and had no ability to fulfill these financial obligations.

To avoid losing the lease, Mullin and another potential investor, Joseph Ballarini, approached James B. Orthwein, Jr. and P.J. Orthwein (the "Orthweins"), to discuss the possible participation of the Orthweins in a family entertainment venture. Eventually, these parties worked through the details of a business plan and formed Boomer's. Thereafter, Boomer's negotiated with the Airport Authority regarding the assignment of the lease from the Debtor to Boomer's. The lease was assigned to Boomer's on April 7, 1993, and Boomer's assumed all obligations under the lease including the amendments thereto.

In conjunction with the formation of Boomer's and the subsequent assignment of the lease, Boomer's agreed to pay Mullin $180,000 in twelve $15,000 monthly installments. In addition, and allegedly as a further incentive for Mullin to work with the investing partners on the development of Boomer's, 220 shares of Boomer's was issued in favor of Robert and Jolie Mullin, as tenants by the entirety. By earlier order, this Court determined that the Mullins held these shares in constructive trust for the benefit of the Debtor and that the shares are property of the Debtor's bank-

ruptcy estate. However, before the bankruptcy was filed, Mullin delivered the shares to Stoeppelwerth, allegedly as security for money advanced to Mullin.

The issues raised by the Trustee's complaint are whether the shares should be turned over to the Trustee and whether Stoeppelwerth holds a valid perfected security interest in the shares.

## The Relationship

Stoeppelwerth and Mullin are long-time friends. Over the years, Stoeppelwerth has advanced approximately $492,000 to Mullin. Both Stoeppelwerth and Mullin consider these advances to be loans. Some of the advanced funds were paid directly to Mullin, while other funds were directed to others, apparently for the benefit of Mullin. There were no promissory notes or written agreements between Mullin and Stoeppelwerth. They have never agreed on an interest rate to be paid on the advances to Mullin, and Stoeppelwerth testified that he has no intention of suing Mullin if the advances are not returned. At the time that the shares in the stock were delivered to Stoeppelwerth, he was owed approximately $223,000 from Mullin. Both Mullin and Stoeppelwerth testified that at the time of the delivery of the shares, they had discussions relating to securing the advances made by Stoeppelwerth. Upon the Mullins' receipt of the shares of Boomer's, the shares allegedly were delivered to Stoeppelwerth as security for the loans made to Mullin. The Trustee contends that these advances were not loans and that Stoeppelwerth does not hold a security interest in the shares.

## Turnover

This Court has already determined that the shares in Boomer's are property of the bankruptcy estate. Based on the findings below that Stoeppelwerth does not hold a valid security interest in the shares, the Court will enter judgment in favor of the Trustee and require Stoeppelwerth to turn over the shares.

## Validity of Security Interest.

Pursuant to Florida Statute 679.203(1) a security interest does not attach to collateral unless:

(a) The collateral is in the possession of the secured party pursuant to agreement

. . .

(b) Value has been given; and

(c) The debtor has rights in the collateral.

The parties do not dispute that Stoeppelwerth is in possession of the collateral. The parties do dispute, however, whether Stoeppelwerth is in possession pursuant to agreement, whether value was given and whether Mullin had any rights in the collateral.

## Security Agreement

Although a written security agreement does not exist, both Stoeppelwerth and Mullin testified that there was an oral agreement between them that Stoeppelwerth would hold the shares in Boomers as security for the amount Mullin owed to Stoeppelwerth. When a secured creditor is in possession of the collateral, a written security agreement is not necessary in order to perfect a security interest. *Matter of Jay*, 8 B.R. 774, 776 (M.D.Fla. 1981). In a case of first impression, the court in *In re Chuning*, 70 B.R. 98 (Bankr. W.D.Mo.1987), set forth four criteria to apply to determine whether an oral security agreement exists.

First: The burden of proof should be on the proponent of the alleged oral security agreement.

Second: The evidence should be clear that language evidencing a definite intent on the part of both the debtor and the creditor was used.

Third: Exclusive possession of the collateral should pass to the creditor contemporaneous with the oral agreement.

Fourth: There should be some line of demarcation that clearly indicates pos-

session is not in the debtor or has changed its previous posture.

*Chuning*, 70 B.R. at 100. Stoeppelwerth has met each of these criteria. Both men testified that the shares were delivered to Stoeppelwerth so that the loans extended to Mullin would be secured. Further, the oral agreement and the passage of the shares were effected contemporaneously or within a proximate time. Finally, there is no dispute that Stoeppelwerth is in possession of the shares.

*Value Exchanged*

■ The Trustee does not dispute that Stoeppelwerth has advanced approximately $492,000 to Mullin over the years. Rather, the Trustee contends that these advances constitute gifts because there exist no promissory notes or agreements to repay. There is not an established repayment schedule, nor is Stoeppelwerth charging Mullin an established rate of interest. Further, Stoeppelwerth testified that he had no plans to take affirmative steps toward collecting the outstanding debt. Despite the lack of formality, the Court finds that the advances from Stoeppelwerth to Mullin constitute loans. The trial testimony of Stoeppelwerth and Mullin makes it clear that each of them believed the advances to constitute loans, and they have treated the advances as loans.

*Debtor's Rights in the Collateral*

■ The more difficult issue is whether Mullin had rights in the shares at the time they were delivered to Stoeppelwerth. When Boomer's was formed, Boomer's issued a stock certificate for 220 shares to Robert and Jolie Mullin. Soon thereafter, the Mullins delivered the shares to Stoeppelwerth. For all intents and purposes, it appeared that the Mullins were the owners of the shares. It was not until this Court entered its order on November 3, 1998, finding that the Mullins held the shares in constructive trust for the Debtor, that Stoeppelwerth become aware that Mullin did not hold any rights in the collateral. The requirement that a debtor must have rights in collateral is order to grant a valid security interest to a secured party exists because, quite obviously, "one cannot incumber another man's property in the absence of consent, estoppel or some other special rule." *First Southern Ins. Co. v. Ocean State Bank*, 562 So.2d 798, 799 (Fla. 1st DCA 1990). That court also stated that a "debtor may have sufficient 'rights' for purposes of § 9–203 if the true owner of the collateral has agreed to the debtor's use of the collateral as security or if the true owner has become estopped to deny the creation or existence of the security interest." *Id.*

There appear to be no reported cases factually analogous to the circumstances *sub judice*. Should a secured creditor be deprived of a valid security interest under circumstances wherein the secured creditor could not have possessed the knowledge to ascertain the true owner of the collateral? In the *Ocean State Bank* case, an employee was given a company car to use in the course of his employment. The employee then pilfered the title from his employer and caused the title to be altered to reflect that he was the true owner. The employee then used the altered title to give Ocean State Bank a security interest in the car for a personal loan. Because the employee did not have any interest in the car, the appellate court determined that Ocean State did not have a valid security interest even though it took the necessary steps to protect itself. Although in the instant case, Mullin did not fraudulently obtain the shares in Boomer's from the Debtor, this Court did determine that the shares rightfully belonged to the Debtor. Thus, Mullin owned no interest in the shares to transfer to Stoeppelwerth.

The next issue to determine is whether the Debtor, as the true owner of the shares, consented to the use of the shares as collateral for the loans extended by Stoeppelwerth. This Court has already determined that Mullin ignored the legal fiction of the corporate Debtor and con-

ducted business for his personal benefit. As such, the Court finds that Mullin never sought nor obtained the Debtor's consent to use the shares as collateral for loans extended by Stoeppelwerth. Thus, Stoeppelwerth does not possess a valid security interest in the shares.